UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

NELSON SOSA RODRIGUEZ,

        Petitioner,

        v.                                20-CV-97 (JLS)

THOMAS FEELEY, in his official
capacity as Field Office Director,
Buffalo Field Office, U.S. Immigration
& Customs Enforcement,

JEFFREY SEARLS, in his official
capacity as Acting Assistant Field
Office Director and Administrator,
Buffalo Federal Detention Facility,

KEVIN K. MCALEENAN, in his official
capacity as Acting Secretary, U.S.
Department of Homeland Security[1]

WILLIAM P. BARR, in his official
capacity as Attorney General, U.S.
Department of Justice,

        Respondents.

_____

**<u>DECISION AND ORDER</u>**

---

[1] In his initial petition, Sosa Rodriguez sued Kevin K. McAleenan in his official capacity as Acting Secretary of the Department of Homeland Security. Dkt. 1, at 3-4. His and the government's subsequent submissions name Chad F. Wolf as the respondent in that capacity. *See, e.g.*, Dkts. 4-6. This substitution aside, the parties dispute which respondents are proper parties. *See* Dkt. 5, at 21-22; Dkt. 6, at 13-15. The Court declines to decide this issue in light of its decision below.

Nelson Sosa Rodriguez is a native and citizen of El Salvador who entered the United States in March 2013.  He has been detained at the Buffalo Federal Detention Facility pending removal proceedings for approximately 27 months, and petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.[2]

Sosa Rodriguez is currently detained under 8 U.S.C. § 1226(c).  Section 1226(c) requires detention of aliens convicted of certain crimes pending removal proceedings and does not afford a hearing at which the alien may advocate for release.  Sosa Rodriguez argues that Section 1226(c), as applied to him, violates his Fifth Amendment procedural due process rights because it requires his continued detention, without a bond hearing, pending a final removal order.  Sosa Rodriguez also argues that his continued detention violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(2)(A), (E).  In addition, he argues that he has not received adequate medical care while detained by the United States Department of Homeland Security, Immigration and Customs Enforcement ("DHS"), in violation of the Rehabilitation Act, 29 U.S.C. § 794.

Sosa Rodriguez seeks "immediate[] release."  Dkt. 1, at 15.[3]  In the alternative, Sosa Rodriguez asks that the Court order the government to hold a bond hearing at which he may contest his continued detention.  If the Court grants this request, Sosa Rodriguez asks that DHS establish, by clear and convincing

---

[2] Sosa Rodriguez filed this petition on January 24, 2020.  Thereafter, this case was assigned to the Honorable Lawrence J. Vilardo.  On May 5, 2020, this case was reassigned to the undersigned.  Dkt. 7.
[3] All page references are to the pagination automatically generated by CM/ECF.

2

evidence, that his continued detention is necessary and justified.  *Id.*  He also asks this Court to enjoin the government from transferring him outside of this district during the pendency of his petition.  *Id.*

 For the reasons that follow, the Court denies the relief Sosa Rodriguez requests and dismisses his petition without prejudice.

## BACKGROUND

## I.   Background and Detention

It is unclear when and where Sosa Rodriguez entered the United States, but he did so without inspection. Dkt. 4, at 2 ¶ 3; Dkt. 4-1, at 2 ¶ 5.  By Sosa Rodriguez's account, it was at some point in March 2013.  Dkt. 1, at 7 ¶ 34.  His father, according to Sosa Rodriguez, is a "prominent military figure" in El Salvador. *Id.* at 7 ¶ 32.  Sosa Rodriguez fled El Salvador because he was "attacked and threatened by MS-13 gang members, who sought [his] military intelligence, skills, and influence." *Id.* at 7 ¶ 33.

According to the government, Sosa Rodriguez has been criminally convicted three times since entering the United States.  He was first convicted on November 17, 2016, in Nassau County First District Court, of violating New York State's Vehicle and Traffic Law ("VTL") § 1192.2, which prohibits operating a motor vehicle while intoxicated.  Dkt. 4, at 3 ¶ 5; Dkt. 5, at 3-4.  The court granted a conditional discharge, imposed a fine, and (despite that Sosa Rodriguez never had a New York State driver's license) "revoked" his license.  Dkt. 4, at 3 ¶ 5; Dkt. 5, at 4 n.2.

3

Sosa Rodriguez's second and third convictions resulted from a car accident on April 16, 2016. Dkt. 1, at 7 ¶¶ 36-37; Dkt. 4, at 3 ¶ 6; Dkt. 5, at 4. That day, Sosa Rodriguez lost control of the car that he was driving and hit a tree. The car "split into two pieces." Dkt. 4, at 3 ¶ 6. The accident seriously injured Sosa Rodriguez, who lost one of his legs as a result. *Id.*; *see also* Dkt. 1, at 7 ¶ 36. The passenger in the car died from his injuries. *Id.* On March 1, 2018, Sosa Rodriguez was convicted in the Supreme Court of New York, Nassau County, of manslaughter in the second degree, in violation of New York State Penal Law § 125.15(1), and sentenced to a term of imprisonment of one to three years. Dkt. 4, at 3-4 ¶ 8; Dkt. 1, at 7 ¶ 37. Sosa Rodriguez was also convicted of "Aggravated Unlicensed Operation of a Motor Vehicle in the Second Degree" in violation of VTL § 511.2. Dkt. 4, at 4 ¶ 8. He was fined and sentenced to six months' imprisonment. *Id.*

DHS lodged an Immigration Detainer on May 8, 2018, asking to be notified before Sosa Rodriguez was released from state custody. Dkt. 4, at 4 ¶ 9; Dkt. 4-1, at 4 ¶ 11; Dkt. 4-2, Ex. A at 10. On May 30, 2018, Sosa Rodriguez was placed in immigration removal proceedings by a Notice to Appear ("NTA"). Dkt. 4, at 4 ¶ 10; Dkt. 4-1, at 4 ¶ 12; Dkt. 4-2, Ex. A at 11-13.

The NTA charged Sosa Rodriguez as being a native and citizen of El Salvador, subject to removal pursuant to Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General. *See* Dkt. 4, at 4 ¶ 10;

4

Dkt. 4-1, at 4 ¶ 12; Dkt. 4-2, Ex. A at 13.  The NTA also charged him pursuant to INA § 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(I), as an alien who has been convicted of a crime involving moral turpitude.  *Id.*  Sosa Rodriguez appeared before the Ulster, New York, Immigration Court on August 27, 2018, at which point his counsel requested an adjournment to further prepare.  Dkt. 4, at 4 ¶¶ 11-12; Dkt. 4-1, at 4 ¶¶ 13-14.

On or about September 9, 2018, Sosa Rodriguez was released from the New York State Department of Corrections and Community Supervision and placed in DHS custody.  Dkt. 4, at 4 ¶ 13; Dkt. 4-1, at 4 ¶ 15.  His case was then transferred to the Batavia, New York, Immigration Court.  *Id.*

On September 11, 2018, DHS determined that Sosa Rodriguez would remain in its custody pending a final administrative determination of his case.  Dkt. 4, at 5 ¶ 14; Dkt. 4-1, at 4-5 ¶ 16.  Sosa Rodriguez requested that an Immigration Judge ("IJ") review this custody determination, but "refused to sign" the Notice of Custody Determination form.  *Id.*; *see also* Dkt. 4-2, Ex. A at 17.

Sosa Rodriguez appeared before the IJ on October 30, 2018 for a master calendar hearing, where he "admitted the factual allegations in the NTA and conceded each charge of removability."  Dkt. 4, at 5 ¶ 15.  Counsel for Sosa Rodriguez indicated he would apply for relief from removal, and proceedings were continued until December 19, 2018.  *Id.*

Also on October 30, 2018, an IJ reviewed Sosa Rodriguez's custody status.
Counsel for Sosa Rodriguez conceded that he "was not eligible for bond given that
he had been convicted of a crim[e] of moral turpitude and substance to mandatory
detention" under 8 U.S.C. § 1226(c).  *See* Dkt. 4, at 5 ¶ 16; *see also* Dkt. 4-4, Ex. A at
36 ("I don't believe that [he] is eligible for bond.  I believe he's subject to mandatory
detention under [INA §] 236(c).").  Accordingly, the IJ denied his request for a
change in custody status.  *See* Dkt. 4, at 5 ¶ 16; *see also* Dkt. 1, at 7 ¶ 38 ("[T]he IJ
found that Petitioner was subject to mandatory detention under INA [§] 236(c)
because of the conviction he suffered in 2018.").  Sosa Rodriguez's counsel reserved
his right to appeal the IJ's decision to the Board of Immigration Appeals ("BIA"),
but did not do so.  Dkt. 4, at 5 ¶ 16; Dkt. 4-1, at 5 ¶ 18; Dkt. 4-4, Ex. A at 36-37.

Sosa Rodriguez maintains that this hearing was "not a bond hearing," and
that he "was provided no further opportunity to address whether or not he was a
flight risk or a danger to the community, and the Department of Homeland Security
was not required to provide any evidence."  Dkt. 6, at 2.  The government, in
response, argues that Sosa Rodriguez is not entitled to a "new hearing" because he
"has been afforded the process he is due."  Dkt. 5, at 10-11.  The government states
that Sosa Rodriguez was "provided an opportunity to challenge the basis of his
custody" at the October 30, 2018 hearing, and that "[h]is decision not to challenge
his detention should not be held against the government."  *Id.*

Proceedings on December 19, 2018 were continued to February 26, 2019, at
which point Sosa Rodriguez and his counsel appeared before the IJ.  Dkt. 4, at 6 ¶¶

19-20.  The IJ denied Sosa Rodriguez's applications for relief from removal and ordered him removed from the United States to El Salvador.  *See id.*; Dkt. 1, at 9 ¶ 47; Dkt. 4-1, at 5 ¶¶ 20-21; Dkt. 4-2, Ex. A at 25-44.

Sosa Rodriguez appealed the IJ's order of removal to the BIA on March 28, 2019.  Dkt. 4, at 6 ¶ 20.  After Sosa Rodriguez's counsel requested an extension, the IJ set a briefing deadline of June 12, 2019.  Dkt. 4, at 6 ¶ 21; Dkt. 4-1, at 6 ¶ 22.  On August 22, 2019, the BIA remanded the case to the Immigration Court for further proceedings.  Dkt. 1, at 9 ¶ 48; Dkt. 4, at 6 ¶ 22; Dkt. 4-1, at 6 ¶ 25; Dkt. 4-3, Ex. A at 17-21.  The IJ again denied Sosa Rodriguez's applications for relief from removal on December 5, 2019, and ordered him removed to El Salvador.  Dkt. 1, at 10 ¶ 50; Dkt. 4, at 6 ¶ 24.

Sosa Rodriguez appealed the IJ's decision to the BIA.  *See* Dkt. 1, at 10 ¶ 51; Dkt. 4, at 6 ¶ 25.  His appeal remains pending.  *Id.*[4]  He maintains he "is not expected to be removed to El Salvador anytime in the near future, because his removal proceedings remain pending before the Board."  Dkt. 1, at 9 ¶ 46.

Sosa Rodriguez is being held at the Buffalo Federal Detention Facility pending completion of immigration removal proceedings.  *See* Dkt. 1, at 2 ¶ 1; Dkt. 4, at 7 ¶ 26.  He has been detained by DHS since September 10, 2018, except for "the times he was hospitalized or receiving medical care off-site."  Dkt. 1, at 8 ¶ 39.

---

[4] The Court has no further information about the status of Sosa Rodriguez's immigration proceedings.

The parties' accounts of these events vary in detail but agree on the basic timeline set forth above.

## II. <u>Medical Conditions</u>

As discussed, Sosa Rodriguez sustained "life-threatening injuries" because of the April 2016 car accident. Dkt. 1, at 7 ¶ 36. He is an amputee and "requires the use of a wheelchair to ambulate." *Id.* at 2 ¶ 2. Sosa Rodriguez "suffers from various physical and neurological conditions related to his disabilities." *Id.* He alleges his disabilities "have been exacerbated by the falls and lack of medical care he has endured while in detention." *Id.*; *see also id.* at 3 ¶ 9 (alleging that his falls and "other medical complications" while in detention have "significantly worsened his physical and cognitive health").

Sosa Rodriguez alleges he fell three times while detained. First, Sosa Rodriguez fell when his shower chair collapsed beneath him at Wende Correctional Facility during his transfer to DHS custody. Dkt. 1, at 8 ¶ 40. He alleges he did not receive x-rays despite recalling "significant pain in his back" when he arrived at the Buffalo Federal Detention Center. *Id.*; *see also id.*, Ex. D at 27 (recommending x-rays "[M]onday morning pending . . . progress throughout the weekend"). Then, on October 13, 2018, Sosa Rodriguez "fell in his cell while attempting to ambulate, and cracked his head open on the corner of a metal table." *Id.* at 8 ¶ 41. He was treated at Erie County Medical Center. *Id.* Sosa Rodriguez was again injured on October 19, 2019, when he "tried to catch himself from falling by bearing weight on his

remaining foot." *Id.* at 8 ¶ 42.  X-rays provided on December 9, 2019 revealed "unhealed fractures" in his foot.  *Id.*

Sosa Rodriguez suffers "from the loss of his limb and significant pain . . . diffuse traumatic brain injury with memory/processing impairment, phantom limb syndrome with pain, primary open-angle glaucoma, major depressive disorder, and several other conditions."  Dkt. 1, at 9 ¶ 43.  He maintains his conditions have "worsened significantly since he was transferred to ICE custody."  *Id.* at 9 ¶ 44.  Since his transfer to DHS custody, Sosa Rodriguez has been "diagnosed with traumatic brain injury and memory/processing impairment, and the fractures in his foot that were once healed are now unhealed."  *Id.* at 9 ¶¶ 44-45.

## III.  **Procedural History**

Sosa Rodriguez filed this petition on January 24, 2020.  Dkt. 1.  The government answered and filed a memorandum and declarations in opposition. Dkts. 4, 5.  Sosa Rodriguez replied.  Dkt. 6.  His Section 1226(c) detention, which began in September 2018, has lasted 27 months to date.[5]  *See* Dkt. 1, at 8 ¶ 39; Dkt. 4, at 4 ¶ 13.

---

[5] On or about September 9, 2018, venue changed from Ulster Immigration Court to Batavia Immigration Court, likely based on Sosa Rodriguez's transfer from state custody to the Buffalo Federal Detention Facility in Batavia, New York.  *See* Dkt. 4-1, at 4 ¶¶ 14-15; *see also* Dkt. 1, at 8 ¶ 39 (alleging Sosa Rodriguez has been detained in Batavia since September 10, 2018).

## ANALYSIS

I. **Sosa Rodriguez's Constitutional Claims**

### A.   Jurisdiction

Jurisdiction over substantive challenges to final deportation, exclusion, and removal orders resides with the circuit courts; district courts lack jurisdiction over the merits of such orders. *See Gittens v. Menifee*, 428 F.3d 382, 384 (2d Cir. 2005) (holding that the REAL ID Act "eliminates habeas jurisdiction over final orders of deportation, exclusion, and removal, providing instead for petitions of review . . . , which circuit courts alone can consider"). District courts can, however, review claims that pre-removal detention is unconstitutional. *See Demore v. Kim*, 538 U.S. 510, 516-17 (2003). In this way, habeas corpus review is available to persons "in custody in violation of the Constitution or laws or treaties of the United States." *See* 28 U.S.C. § 2241(c)(3).

Sosa Rodriguez claims that his detention is unconstitutional based on its duration. Specifically, he claims that his now 27-month detention under Section 1226(c) without a bond hearing violates his Fifth Amendment procedural due process rights. *See, e.g.*, Dkt. 1, at 2 ¶¶ 3-4; *id.* at 6 ¶ 29; *id.* at 14 ¶ 69. The government does not dispute that the Court has jurisdiction over Sosa Rodriguez's "challenge to his continued detention in custody." *See* Dkt. 4, at 2 ¶ 1.

10

B.     **Constitutionality of Section 1226(c)**[6]

It is beyond dispute that the Fifth Amendment "protects [aliens like Sosa

Rodriguez] from deprivation of life, liberty, or property without due process of law."

*See Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *see also Reno v. Flores*, 507 U.S. 292,

306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due

process of law in deportation proceedings.").  Equally clear are the "constraints on

governmental decisions which deprive individuals of 'liberty' or 'property' interests

within the meaning of the Due Process Clause of the Fifth . . . Amendment."

*Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

Sosa Rodriguez's detention is mandatory under 8 U.S.C. § 1226(c), which

provides that the Attorney General "shall take into custody any alien who . . . is

deportable by reason of having committed" certain criminal offenses—including, as

relevant here, a crime of moral turpitude committed within five years of admission

---

[6] Sosa Rodriguez concedes detention under Section 1226(c).  *See, e.g.*, Dkt. 6, at 2.
He similarly conceded that he was "subject to mandatory detention" at a hearing
before the IJ on October 30, 2018.  Dkt. 4-4, Ex. A at 36.  Sosa Rodriguez argues
that the October 30 hearing "[w]as [n]ot [c]onstitutionally [a]dequate" because the
IJ did not "address whether or not he was a flight risk or a danger to the
community" and did not require DHS to "provide any evidence."  Dkt. 6, at 2.  The
Court need not reach this issue because Sosa Rodriguez is not entitled to a bond
hearing; his detention has not become unreasonably prolonged.  Nonetheless, Sosa
Rodriguez has not articulated clear deficiencies with the October 30 hearing—where
the IJ adjourned only after Sosa Rodriguez conceded mandatory detention; the IJ
specifically stated he wanted to provide the "opportunity to address that [issue]";
and counsel for Sosa Rodriguez noted nothing further besides "reserv[ing] appeal."
Dkt. 4-4, Ex. A at 36-37.  *See Demore*, 538 U.S. at 514 ("In conceding that he was
deportable, respondent forwent a hearing at which he would have been entitled to
raise any nonfrivolous argument available to demonstrate that he was not properly
included in a mandatory detention category." (citing 8 CFR § 3.19(h)(2)(ii) (2002);
*Matter of Joseph*, 22 I. & N. Dec. 799, 1999 WL 339053 (BIA 1999)).

into the United States, for which the alien may be sentenced to a term of imprisonment of at least one year. *See* 8 U.S.C. § 1226(c)(1)(C);[7] 8 U.S.C. § 1227(a)(2)(A)(i) ("Any alien who . . . is convicted of a crime involving moral turpitude committed within five years . . . after the date of admission, and . . . is convicted of a crime for which a sentence of one year or longer may be imposed, is deportable.").

The Supreme Court rejected a constitutional challenge to Section 1226(c) in *United States v. Demore*, where it held that "Congress, justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers, may require that persons . . . be detained for the brief period necessary for their removal proceedings." 538 U.S. at 513. In so holding, the Court reiterated the "fundamental premise of immigration law" that, "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Id.* at 521 (quoting *Diaz*, 426 U.S. at 79-80) (internal quotations omitted).

---

[7] If an alien meets these criteria, the Attorney General may order release "only if": (1) release is necessary for certain witness-protection purposes; and (2) the alien "will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." 8 U.S.C. § 1226(c)(2); *see also Jennings v. Rodriguez*, — U.S. — , 138 S. Ct. 830, 837-38 (2018) (explaining that "Section 1226(c) . . . carves out a statutory category of aliens who may *not* be released under § 1226(a)" and summarizing Section 1226(c)'s detention and release requirements). The Attorney General also must consider the severity of the criminal offense. *See* 8 U.S.C. § 1226(c)(2).

The Court's holding in *Demore* aligns with its prior recognition that "the responsibility for regulating the relationship between the United States and [its] alien visitors [is] committed to the political branches of the Federal Government." *Diaz*, 426 U.S. at 81. Indeed, "[o]ver no conceivable subject is the legislative power of Congress more complete." *Flores*, 507 U.S. at 305 (internal quotations and citations omitted). Because decisions regarding immigration "may implicate [the United States'] relations with foreign powers, and [because] a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently . . . more appropriate [for] either the Legislature or the Executive than [for] the Judiciary." *Diaz*, 426 U.S. at 81.

Against this backdrop, courts must give particular care to the constitutional interests, governance concerns, and individual rights involved on these weighty questions. Indeed, courts must employ "a narrow standard of review of decisions made by the Congress or the President" and must exercise "the greatest caution" in evaluating constitutional claims that implicate those decisions. *See Diaz*, 426 U.S. at 81-82. In this way, courts strive for the proper constitutional balance in Section 1226(c) cases. *See Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 234 (3d Cir. 2011) ("[C]ourts reviewing petitions for writ of habeas corpus must exercise their independent judgment as to what is reasonable."), *abrogated on other grounds*, *Jennings*, — U.S. —, 138 S. Ct. 830 (2018); *Garcia v. Whitaker*, No. 6:18-cv-06836-MAT, 2019 WL 3802536, at *8 (W.D.N.Y. Aug. 13, 2019) ("*Jennings* left open the

possibility that individual detentions without bond hearings might eventually violate due process.").

Detention during removal proceedings "is a constitutionally permissible part of that process." *Demore*, 538 U.S. at 531. There is no bright-line rule as to when a period of detention under Section 1226(c) may violate due process. *See Johnson v. Orsino*, 942 F. Supp. 2d 396, 409 (S.D.N.Y. 2013) (noting that "the Supreme Court did not set a bright-line outer limit for what constitutes a permissible period of detention" and that courts "must assess the duration of the detention in proper context"); *Johnson v. Phillips*, No. 10-CV-480A, 2010 WL 6512350, at *7 (W.D.N.Y. Dec. 20, 2010) ("The Supreme Court in *Demore* noted the average time for conducting a removal proceeding (including appeal), but it did not set the outer limit for how long an alien may be detained while awaiting determination of his or her removal proceeding." (citation omitted)). In *Demore*, the Court reiterated its "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *See* 538 U.S. at 526; *see also id.* at 513 (alien's detention under Section 1226(c) "for the brief period necessary for their removal proceedings" was constitutional).

Detention pending a determination of removability has a "definite termination point." *Demore*, 538 U.S. at 529. Where a petitioner appeals the IJ's decision to the BIA, such detention ends with a BIA determination and, if applicable, a final order of removal. *See, e.g., id.* at 529. Other delays attributable to a petitioner may also permissibly extend the termination point. *See id.* at 530

14

(identifying delay in petitioner's request for a continuance of his removal hearing);
*id.* at 531 n.14 (concluding, where petitioner argued that "the length of detention
required to appeal may deter aliens from exercising their right to do so," that "the
legal system . . . is replete with situations requiring the making of difficult
judgments as to which course to follow, and, even in the criminal context, there is
no constitutional prohibition against requiring parties to make such choices"
(internal quotations and citations omitted)).

Because the Due Process Clause prohibits "arbitrary" deprivations of liberty,
a detainee "could be entitled to an individualized determination as to his risk of
flight and dangerousness if the continued detention became unreasonable or
unjustified." *Demore*, 538 U.S. at 532 (Kennedy, J., concurring).  For instance, an
"unreasonable delay by the [government] in pursuing and completing deportation
proceedings" may suggest that detention is being used "not to facilitate deportation,
or to protect against risk of flight or dangerousness, but to incarcerate for other
reasons." *Id.* at 532-33.  That analysis depends on "the circumstances of [the] case."
*Id.* at 533.

*Demore* also highlights the "process" that has been built into a mandatory
detention under Section 1226(c)—for example, that Section 1226(c) applies to
detainees whose convictions were generally "obtained following the full procedural
protections [the] criminal justice system offers." *See* 538 U.S. at 513; *id.* at 525 n.9
(noting that "respondent became 'deportable' under § 1226(c) only following criminal
convictions that were secured following full procedural protections"); *Velasco Lopez*

*v. Decker*, 978 F.3d 842, 850 n.7 (2d Cir. 2020) (finding a "sharp contrast" between procedural protections afforded to criminal defendants who are later detained under Section 1226(c) and those afforded to Section 1226(a) detainees); *see also Demore*, 538 U.S. at 531-32 (Kennedy, J., concurring) (describing process available pursuant to *Matter of Joseph*, 22 I. & N. Dec. 799, 1999 WL 339053 (BIA 1999)).

### C.   Guideposts Relevant to the Reasonableness of Section 1226(c) Detention

Since *Jennings*, the Second Circuit "has not addressed . . . the standard to be utilized by courts in addressing procedural due process claims for aliens detained pursuant to § 1226(c) in the immigrant habeas context." *Ranchinskiy v. Barr*, 422 F. Supp. 3d 789, 796-97 (W.D.N.Y. 2019).  District courts in this Circuit, in determining whether the petitioner's "length of detention has become unreasonable or unjustified," have considered factors such as:

> (1) the length of time the petitioner has been detained; (2) the party responsible for the delay; (3) whether the petitioner has asserted defenses to removal; (4) whether the detention will exceed the time the petitioner spent in prison for the crime that made him removable; (5) whether the detention facility is meaningfully different from a penal institution for criminal detention; (6) the nature of the crimes committed by the petitioner; and (7) whether the petitioner's detention is near conclusion.

*Id.* at 797.  If this analysis reveals that the detention is not unreasonably prolonged, there is no procedural due process violation, and the analysis ends.  *See Kabba v. Barr*, 403 F. Supp. 3d 180, 185 (W.D.N.Y. 2019)  If, however, a court concludes that the alien's detention is unreasonably prolonged, its next step considers what process

petitioner is due—*i.e.*, whether the government has "provided the procedural safeguards required by the Due Process Clause." *Id*.[8]

Because a procedural due process analysis is fact- and case-specific, decisions addressing Section 1226(c) due process challenges in similar circumstances reveal certain helpful guideposts. *See Minaya-Rodriguez v. Barr*, 459 F. Supp. 3d 488, 497-499 (W.D.N.Y. May 10, 2020).

For example, procedural due process claims by petitioners detained for 6 to approximately 12 months while awaiting final orders in their immigration proceedings generally do not succeed—unless the government caused extreme delay or engaged in dilatory conduct. *Compare Demore*, 538 U.S. at 530-31 (detention for six months did not violate Fifth Amendment), *and Dryden v. Green*, 321 F. Supp. 3d 496, 502 (D.N.J. 2018) (denying bond hearing where petitioner was detained for "just over a year" and "delay was not the result of any apparent inaction or unreasonable delay on the part of the Government"), *with Hernandez v. Decker*, No. 18-CV-5026 (ALC), 2018 WL 3579108, at *2, *8, *10 (S.D.N.Y. July 25, 2018)

---

[8] To determine the safeguards necessary to ensure that a petitioner receives "the opportunity to be heard at a meaningful time and in a meaningful manner," the Court considers: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used, plus the likely value, if any, of other procedural safeguards; and (3) the government's interest, including the function at issue and the burden that any other procedural requirement would impose. *See Eldridge*, 424 U.S. at 333, 335 (internal quotations and citation omitted); *see also Kabba*, 403 F. Supp. 3d at 188 (citing *Eldridge* factors at "the second step of the two-part inquiry—the process constitutionally due to [petitioner]").

(granting bond hearing where petitioner was detained "just over nine months,"

petitioner "attempted to speed things along" but waited more than a month for an

initial appearance, and the IJ sua sponte adjourned a merits hearing for two

months), *and Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *1, *11

(granting bond hearing where petitioner was detained for "over eight months" and

delay in removal proceedings was "largely attributable to immigration officials'

failure to process and send [petitioner]'s A-file to his counsel").

Generally, petitions based on 15 to 21 months' detention are denied where

some reasonableness factors favor the petitioner, some factors favor the

government, and neither party bears greater responsibility for delay in removal

proceedings. *See, e.g.*, *Garcia*, 2019 WL 3802536, at *8-*9 (denying bond hearing

where petitioner was detained for 17 months, there was "no evidence that the

proceedings [were] prolonged by dilatory tactics on the part of the Government,"

and "neither party [was] at fault for any delay, which appear[ed] largely due to the

burgeoning case docket of the Immigration Court in Batavia");[9] *Lway Mu v.*

*Whitaker*, No. 6:18-cv-06924-MAT, 2019 WL 2373883, at *4 (W.D.N.Y. June 4, 2019)

(denying bond hearing where petitioner was detained for 19 months, some delays

---

[9] In this district, courts' analyses of the delay factor have diverged if delays in removal proceedings result from a backlog in Batavia's Immigration Court. *See* *Kabba*, 403 F. Supp. 3d at 187 n.6 (finding that "to the extent that there is a backlog, responsibility for its impact falls on the government" and that "if there is a burgeoning case docket at the Batavia Immigration Court, that is a problem caused by Congress, the executive branch, or both . . . [b]ut it is certainly not a problem caused by detained aliens"). This Court agrees with the *Garcia* court's view and attributes responsibility for docket-based delays to neither party. *See Garcia*, 2019 WL 3802536, at *9; *see also Minaya-Rodriguez*, 459 F. Supp. 3d at 498 n.7.

were "attributable to strategic decisions by [petitioner] and his attorney," other delays did not result from petitioner's litigation strategy, and there was "no evidence . . that the Government ha[d] unreasonably prolonged [petitioner]'s removal proceedings); *Sigal v. Searls*, No. 1:18-CV-00389 EAW, 2018 WL 5831326, at *6, *7 (W.D.N.Y. Nov. 7, 2018) (denying bond hearing where petitioner was detained "for more than 16 months," noting that "courts in this Circuit considering *habeas corpus* claims related to § 1226(c) have found that delays attributable to normal consideration of an alien's appeal of adverse decisions do not render unreasonable the consequent delay of his ability to gain release into his home country" (internal quotations and citations omitted)); *Thompson v. Lynch*, No. 16-CV-6608 (CJS), 2017 WL 344970, at *6 (W.D.N.Y. Jan. 24, 2017) (denying bond hearing where detention reached 21 months and "petitioner's removal ha[d] been delayed by his own actions in pursuit of relief in the federal courts," so "neither his detention . . . nor its duration" established a due process violation); *Orsino*, 942 F. Supp. 2d at 408-09 (denying bond hearing where petitioner was detained for 15 months and remained in custody solely because he "chose to appeal the IJ's removal order," as he was entitled to, and that "delay caused by his actions [did] not make continued detention unreasonable or unjustified" (internal quotations and citations omitted)); *Phillips*, 2010 WL 6512350, at *6-*7 (recommending denying bond hearing where petitioner was detained for 17 months, the record did "not indicate any delay or foot dragging by the Government," and the "only significant delay" was the roughly nine months petitioner's appeal was pending with the BIA),

*recommendation adopted*, 2011 WL 1465448 (W.D.N.Y. Apr. 18, 2011); *Adler v. U.S.*
*Dep't of Homeland Sec.*, No. 09 Civ. 4093(SAS), 2009 WL 3029328, at *1-*2
(S.D.N.Y. Sept. 22, 2009) (denying bond hearing where petitioner was detained for
over 15 months—"more than twice as long as the maximum duration contemplated
by the *Demore* Court"—but there was "no evidence in the record that the
government ha[d] dragged its feet"). *But see Ranchinskiy*, 422 F. Supp. 3d at 798-
801 (granting bond hearing where detention reached 21 months, some delay was
attributable each party, and "on balance and particularly in view of the length of
the detention and the circumstances surrounding that detention, . . .
continued detention without a bond hearing [was] constitutionally unjustified");
*Vallejo v. Decker*, No. 18-CV-5649 (JMF), 2018 WL 3738947, at *4 (S.D.N.Y. Aug. 7,
2018) (granting bond hearing where petitioner was detained for almost 17 months
without a hearing, principally because the government was responsible for delays in
removal proceedings that had "no constitutionally acceptable reason").

When detention exceeds 24 months, the petitioner generally prevails if some
reasonableness factors favor the petitioner and some favor the government. *See,*
*e.g.*, *Chavez-Alvarez v. Warden York Cnty. Prison*, 783 F.3d 469, 470, 477 (3d Cir.
2015) (granting bond hearing where petitioner was detained for 34 months and
"neither the Government nor [petitioner] caused any extraordinary delays" and the
parties "act[ed] in good faith"), *abrogated in part and on other grounds*, *Jennings*,
138 S. Ct. 830; *Leslie v. Att'y Gen. of the U.S.*, 678 F.3d 265, 266, 270-71 (3d Cir.
2012) (granting bond hearing where petitioner was detained for almost 48 months

and delay resulted from a combination of government conduct and petitioner's successful efforts to contest removal), *abrogated in part and on other grounds*, *Jennings*, 138 S. Ct. 830; *Constant v. Barr*, 409 F. Supp. 3d 159, 163, 169 (W.D.N.Y. 2019) (granting bond hearing where petitioner was detained for 25 months and "the record [did] not show that Petitioner was engaging in bad faith delay tactics").

Petitioners detained for more than 24 months may not prevail if they employ a litigation strategy that can be viewed as dilatory or unusual compared to similarly situated detainees. *See, e.g.*, *Dor v. Dist. Dir., I.N.S.*, 891 F.2d 997, 999, 1003 (2d Cir. 1989) (holding that no procedural due process violation existed where petitioner was detained for 60 months because "his sustained detention" resulted from "the simple fact that—at his urgent request and by [a] stay—[the court] allowed his application to be exhaustively adjudicated" by the government"); *Manley v. Delmonte*, No. 17-CV-953, 2018 WL 2155890, at *1-*2 (W.D.N.Y. May 9, 2018) (denying petition where detention exceeded 24 months, petitioner asked the Second Circuit to defer consideration of his immigration appeal until a state appeal of his criminal conviction concluded, and most delays were at petitioner or his attorney's request); *Luna-Aponte v. Holder*, 743 F. Supp. 2d 189, 190, 199 (W.D.N.Y. 2010) (denying bond hearing where petitioner was detained for approximately 39 months and filed an untimely appeal to the Second Circuit).

These guideposts, though not dispositive, inform the Court's analysis of Sosa Rodriguez's request for a bond hearing.

### D. Sosa Rodriguez's Detention Comports with the Fifth Amendment.

Sosa Rodriguez challenges his continued detention on procedural due process grounds, arguing that his now 27-month detention has become unreasonably prolonged, and that the government must provide an individualized bond hearing. The Supreme Court's holding and rationale in *Demore* provide the baseline for this Court's analysis. And the multi-factor test applied by district courts within this Circuit provides an additional framework. Based on this baseline and framework, the Court concludes that Sosa Rodriguez's detention has not been unreasonably prolonged in violation of his due process rights.

The critical issue is whether Sosa Rodriguez's 27-month detention pending determination of his removal proceedings is unconstitutional beyond the "limited period" contemplated in *Demore*. 538 U.S. at 526. The length of Sosa Rodriguez's detention is significant. And he argues that he does "not expect[] to be removed . . . anytime in the near future, because his removal proceedings remain pending before the Board [of Immigration Appeals]." Dkt. 1, at 9 ¶ 46; *see also* Dkt. 6, at 8-10. Without more, however, his pending appeal to the BIA does not impermissibly extend his detention.

According to the government, "[o]ther than [Sosa Rodriguez's] appeal [of the IJ's removal order], there are no barriers to his removal." Dkt. 5, at 9. Sosa Rodriguez's detention appears to be near conclusion; the record does not indicate that Sosa Rodriguez's "continued detention will last indefinitely or that his ultimate removal is unlikely," and "if . . . a final order of removal is entered against him,

there do not appear to be any institutional or other barriers to his deportation." *See Lway Mu*, 2019 WL 2373883, at *5. The government expects the BIA to resolve Sosa Rodriguez's appeal "in the reasonably foreseeable future." Dkt. 5, at 17. Sosa Rodriguez's Section 1226(c) detention "will come to an end, one way or another, upon the disposition of his appeal." *Sigal*, 2018 WL 5831326, at *6. In addition, the harm that would result if detention continued for an unreasonable amount of time is mitigated by Sosa Rodriguez's ability to file a new petition if the facts meaningfully change.

Indeed, the length of detention "is not to be considered in isolation." *See Garcia*, 2019 WL 3802536, at *10; *see also Dryden*, 321 F. Supp. 3d at 502 (holding that it was "insufficient that Petitioner's detention ha[d] merely become suspect by reaching this six month to a year threshold," and that petitioner "must show that his ongoing detention is so unreasonable or arbitrary that it has actually violated his rights under the Due Process Clause"). As stated elsewhere, "the sheer length of the proceedings is not alone determinative of reasonableness." *De La Rosa v. Barr*, No. 6:19-cv-06418-MAT, 2019 WL 5842906, at *5 (W.D.N.Y. Nov. 7, 2019) (quotations and citations omitted).

*Demore* allows the Court to examine the reason for any delay in Sosa Rodriguez's removal. *See Demore*, 538 U.S. at 530-31 n.14-15; *see also Ranchinskiy*, 422 F. Supp. 3d at 797. At least 90 days of delay are attributable to Sosa Rodriguez's counsel's requests for extensions during his immigration proceedings. *See* Background, Section I, *supra*; *see also* Dkt. 5, at 6 (discussing a continued

23

proceeding in 2018 and an extension request in 2019).  In addition, Sosa Rodriguez
chose to pursue an appeal to contest his removal.

To be sure, Sosa Rodriguez is permitted to request extensions from the IJ,
just as he may avail himself of "process" by appealing at the BIA.  But he cannot
expect any resulting delay to bolster his due process claim.  If a petitioner could
delay enough and thereby earn release, he could defeat the process.  *See Demore*,
538 U.S. at 531 n.14 (concluding "there is no constitutional prohibition against
requiring parties" to "mak[e]. . . difficult judgments," such as whether to risk a
lengthier detention by exercising their right to appeal); *id.* at 530-31 n.15
(considering the delay resulting from the alien's request for a continuance of his
removal hearing so he could obtain relevant documents); *Doherty v. Thornburgh*,
943 F.2d 204, 211 (2d Cir. 1991) (concluding that the alien's "litigation strategy
[was] perfectly permissible" but that he could "not rely on the extra time resulting
therefore to claim that his prolonged detention violates substantive due process");
*Manley*, 2018 WL 2155890, at *2 (denying bond hearing where petitioner was
"partly in control of the sequence of events that will end his detention and partly
responsible for the length of the proceedings that have extended it" because he or
his attorney "prolonged the finality of [his] removal order" by requesting extensions
and stays; "having that right does not mean it may be exercised without
consequence").

Sosa Rodriguez's due process claim also fails under the narrow test proposed
in Justice Kennedy's *Demore* concurrence.  The circumstances of Sosa Rodriguez's

detention do not support an inference that his detention is arbitrary, unreasonable, or unjustified. *Demore*, 538 U.S. at 532. There are no facts suggesting that DHS seeks to detain Sosa Rodriguez for "other reasons" beyond facilitating deportation or protecting against risk of flight or dangerousness.[10] *Id.* at 532-33.

Under these circumstances, this Court concludes—as have others on similar facts[11]—that Sosa Rodriguez's continued detention comports with his procedural due process rights.[12] If Sosa Rodriguez's detention were pursuant to Section 1226(a), the Court might have reached a different conclusion. *See generally Velasco Lopez*, 978 F.3d 842. But upon review of Sosa Rodriguez's Section 1226(c) detention and the circumstances surrounding it, the Court finds no evidence that his detention has become unjustified, unreasonable, or arbitrary—especially in light of the nature of his conviction and the absence of any apparent inaction or bad faith on

_____

[10] The Court's analysis of the nature of the underlying offense that resulted in Sosa Rodriguez's Section 1226(c) detention also supports this conclusion. Sosa Rodriguez argues that he does not present a risk of dangerousness to the community because his manslaughter conviction involved recklessness, not willfulness, and because he is "confined to a wheelchair" with "serious medical conditions." Dkt. 6, at 8. The Court disagrees, and concludes that his conviction demonstrates a risk of dangerousness to the community. This bears on the reasonableness of his continued detention. *See Ranchinskiy*, 422 F. Supp. 3d at 797.

[11] The Court has considered where Sosa Rodriguez's detention falls among the guideposts discussed above. *See* Analysis, Section I(C), *supra*. That consideration supplements—but does not replace—the Court's analysis of *Demore* and the reasonableness factors applied by district courts in this Circuit.

[12] As the government states, Sosa Rodriguez "does not allege a violation of his substantive due process rights." *See* Dkt. 5, at 9. Substantive due process "prevents the government from engaging in conduct that shocks the conscience, . . . or interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (internal quotations and citations omitted). Sosa Rodriguez's detention has not become so unreasonably prolonged so as to render his confinement unconstitutional.

the part of the government. The Constitution and binding case law do not require a contrary outcome at this time, no matter the somewhat sympathetic fact pattern presented in this petition.

## II.   Sosa Rodriguez's Statutory Claims

### A.   Sosa Rodriguez's Administrative Procedure Act Claim

Sosa Rodriguez alleges his "prolonged civil detention" and "[t]he procedures employed in detaining [him]" violate the APA, 5 U.S.C. §§ 706(2)(A), (E). *See* Dkt. 1, at 2 ¶ 4; *id.* at 3 ¶ 10; *id.* at 15 ¶¶ 72-73. He requests release so he may seek medical care. *Id.* at 3 ¶ 10. The Court rejects his APA claim. As an initial matter, it is not clear that the Court has jurisdiction over this claim. *See* 5 U.S.C. § 701(a); 8 U.S.C. § 1226(e); *see also Nikolic v. Decker*, No. 19-CV-6047-LTS, 2019 WL 5887500, at *3 (S.D.N.Y. Nov. 12, 2019) (citing 8 U.S.C. § 1252(b)(9) and dismissing detainee's APA claim, which alleged that DHS failed to accommodate his disability, for lack of subject matter jurisdiction). Regardless, Sosa Rodriguez fails to establish an agency action or inaction within the context of 5 U.S.C. §§ 706(1) or (2).

### B.   Sosa Rodriguez's Rehabilitation Act Claim

Sosa Rodriguez alleges his detention violates Section 504 of the Rehabilitation Act. *See* Dkt. 1, at 15 ¶¶ 74-75 (citing 29 U.S.C. § 794). To assert a claim under this Section, "a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) the defendant is subject to one of the Acts; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the

26

defendant because of his disability." *See McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (citation omitted). The parties focus on the third element. *See, e.g.*, Dkt. 5, at 20-21; Dkt. 6, at 12-13.

Sosa Rodriguez alleges that the government has "failed to provide necessary medical care" and also has "prevented" him from "seeking appropriate medical care for himself." Dkt. 1, at 13 ¶ 63. In support, Sosa Rodriguez points to the treatment he received after falling three times. *See* Background, Section II, *supra*.

As the government argues, Sosa Rodriguez does not allege that he was denied medical services, or otherwise discriminated against, because of his disability. Dkt. 5, at 21. Accordingly, the Court dismisses his Rehabilitation Act claim. *See Schnauder v. Gibens*, 679 F. App'x 8, 11 (2d Cir. Feb. 10, 2017) (affirming dismissal of Rehabilitation Act claim where plaintiff had "not pleaded facts showing that denial of treatment was attributable to bias based on disability," so "his pleadings [did] not admit an inference of proscribed discrimination"); *Montalvo v. Lamy*, 139 F. Supp. 3d 597, 611 (W.D.N.Y. 2015) (dismissing Rehabilitation Act claim for failure to state a claim where plaintiff did not "allege facts plausibly supporting the inference that he was excluded on the basis of disability"). At most, Sosa Rodriguez alleges that aspects of his recent medical care have been inadequate. *See, e.g.*, Dkt. 1, at 15 ¶ 75. But that is insufficient. *See Thompson v. United States*, No. 09-CV-0964M, 2010 WL 1910293, at *3 (W.D.N.Y. May 7, 2010) (dismissing Rehabilitation Act claim where plaintiff alleged that he was "denied adequate medical care at the

Federal Detention Facility, not that he [had] been denied access to programs or benefits on account of a disability").

## <u>CONCLUSION</u>

For these reasons, the relief requested in Sosa Rodriguez's petition for a writ of habeas corpus is denied.  His petition is dismissed without prejudice to filing a new petition in the future based on new and different facts, consistent with the analysis above.  His request to enjoin the government from transferring him outside of this district during the pendency of his petition is denied as moot.  Because the Court has dismissed all of Sosa Rodriguez's claims, his request for costs and attorney's fees pursuant to 28 U.S.C. § 2412 is denied.  The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:      December 15, 2020
             Buffalo, New York

_____
JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE